IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

MICHAEL JAY HARRIS,

  Petitioner,

v.               No. 1:20-cv-01215-JDB-jay

UNITED STATES OF AMERICA,

  Respondent.

ORDER DENYING MOTION TO SUPPLEMENT § 2255 PETITION,
DENYING § 2255 PETITION,
DENYING CERTIFICATE OF APPEALABILITY,
AND
DENYING LEAVE TO APPEAL IN FORMA PAUPERIS

  The Petitioner, Michael Jay Harris,[1] has filed a pro se motion to vacate, set aside, or correct

his sentence (the "Petition") pursuant to 28 U.S.C. § 2255.  (Docket Entry ("D.E.") 1.)[2]  Harris has

also submitted a motion to supplement the Petition.  (D.E. 18.)  For the following reasons, the

Petition and the motion are DENIED.

BACKGROUND

  The Defendant was arrested on February 13, 2017, and, pursuant to an indictment entered

October 16, 2017, charged with one count of possessing with intent to distribute and attempting to

possess with intent to distribute more than fifty grams of actual methamphetamine in violation of

21 U.S.C. §§ 841(a)(1) and 846. (*United States v. Harris*, No. 1:17-cr-10093-JDB-1 (W.D. Tenn.)

("No. 1:17-cr-10093-JDB-1"), D.E. 2.)   After the Defendant was initially appointed Assistant

---

[1] The Court will refer to Harris as "the Defendant" in its discussion of the underlying
criminal case.

[2] Unless otherwise noted, record citations are to documents filed in the present case.

Federal Defender Dianne Smothers to represent him, the Court appointed attorney John Parker, II. (*Id.*, D.E. 28.)

Parker filed a motion to suppress the methamphetamine that was found at the Defendant's house on February 13, 2017, during a sweep of the residence after Harris was arrested on an outstanding arrest warrant.  (*Id.*, D.E. 38.)  Counsel argued that the warrantless search of the Defendant's house, and the resulting "plain view" seizure of the drugs, violated the Fourth Amendment because Petitioner did not give the officers consent to enter his home to conduct a sweep.  After an evidentiary hearing at which Deputy Michael Gilbert, Deputy Larry Wilbanks, and the Defendant testified, the Honorable S. Thomas Anderson denied the motion in a written order.  (*Id.*, D.E. 54.)  The "basic story" that emerged from the hearing was that,

> On February 13, 2017, officers went to Harris's home to execute an outstanding warrant for his arrest. At least one officer approached Harris's front door, knocked, and informed Harris that there was an outstanding warrant for his arrest. Harris did not initially let officers into his home. Instead, he was placed in handcuffs on the porch near his front door. While in handcuffs, Harris expressed concern that his home should be locked up after he was arrested. Harris explained that when police had searched his home the previous summer on an unrelated matter, they left his doors open and some of his possessions had been stolen.
>
> At least one officer—Gilbert—performed a sweep of the home. Harris's girlfriend, Crystal Bailey, was in the home when Gilbert entered, and she left quickly after gathering her belongings. Gilbert made sure that no one else was in the home and turned off a fan. On his way out, Gilbert noticed a white plastic bag (described by the deputies as a Walmart shopping bag) on the couch. Gilbert testified that he could see, in plain view pressed up against the side of the bag, what he believed to be marijuana. Gilbert opened the bag, confirmed it contained marijuana, and also saw what he believed to be methamphetamine. Gilbert then called another deputy to secure a search warrant for Harris's entire home.

(*Id.*, D.E. 118 at PageID 705.)

Both officers testified that the Defendant requested that they secure his home.  (*Id.*, D.E. 54 at PageID 101-02.)  The officers' testimonies were inconsistent, however, about whether Gilbert went through the home with Harris or whether Wilbanks and another officer went through

2

the home and Gilbert stayed on the porch with Harris.  (*Id.*, D.E. 54 at PageID 101-02, 104; *see also id.*, D.E. 118 at PageID 708.)

Harris testified "five officers," not three, "came to his home to execute the arrest warrant." (*Id.*, D.E. 54 at PageID 102.)  He recalled "that after being placed in handcuffs, he told the officers that a female," his girlfriend Crystal Bailey, "was inside the home and he wanted to ask her if she intended to stay."  (*Id.*, D.E. 54 at PageID 102.)  He stated that "[t]he officers refused to allow [him] to go back inside" and that "Deputy Gilbert went inside the home to get [Bailey] and returned within a minute holding the bag containing the drugs."  (*Id.*, D.E. 54 at PageID 102.)  "Defendant denied that he had given the officers permission to enter his home," insisting "that he [had been] concerned that the police might want to question Bailey about an outstanding warrant," and "that if Bailey left, she would not secure the home."  (*Id.*, D.E. 54 at PageID 102.)  He further testified that he "had just had the locks on the home changed within a short time before his arrest" and "that Bailey," who "was his live-in girlfriend[,] . . . did not have a key."  (*Id.*, D.E. 54 at PageID 102.)

The Court found "that Defendant voluntarily gave officers consent to enter his home."  (*Id.*, D.E. 54 at PageID 103.)  The Court "credit[ed] the testimony of the officers concerning Defendant's request to have officers assist him in securing his home before he was taken to jail." (*Id.*, D.E. 54 at PageID 103.)  The Court acknowledged the inconsistencies between the officers' testimonies, but found that "any inconsistency just goes to the strength of each officer's testimony about how the sweep was carried out, not whether they had Defendant's voluntary consent to enter the home." (*Id.*, D.E. 54 at PageID 104.)  The Court found that the officers were consistent in their testimonies "that Defendant requested the opportunity to secure his home and asked for the officers' help in doing so."  (*Id.*, D.E. 54 at PageID 104.)

3

In an information filed June 15, 2018, the Government advised the Court of its intention to seek enhancement of Harris's sentence based on four prior felony drug convictions, pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 851(a).  (*Id.*, D.E. 50.) At the time of the filing, § 841(b)(1)(A) provided that an individual who violates the statute "after two or more prior convictions for a felony drug offense have become final, . . .  shall be sentenced to a mandatory term of life imprisonment without release[.]"  *United States v. Graham*, 622 F.3d 445, 456 (6th Cir. 2010) (quoting 21 U.S.C. § 841(b)(1)(A)).[3]  The Defendant's prior offenses, all committed in Tennessee, were a conviction for delivery of morphine, a conviction for delivery of .5 grams or more of cocaine, a conviction for possession of cocaine with intent to sell or deliver, and a conviction for possession of a Schedule II controlled substance with intent to sell or deliver. (No. 1:17-cr-10093-JDB-1, D.E. 113 at PageID 674.)   On July 16, 2018, the grand jury returned a superseding indictment charging the same offense as in the original indictment.[4]  (*Id.*, D.E. 60.)

After being adjudged guilty by a jury on August 9, 2018 (*id.*, D.E. 77), Harris was sentenced by the undersigned[5] on November 8, 2018, to the statutory term of life imprisonment to be followed by ten years of supervised release (*id.*, D.E. 95).  Judgment was entered on November 16, 2018.  (*Id.*, D.E. 98.)

---

[3] "The term 'felony drug offense' is an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs, marihuana, anabolic steroids, or depressant or stimulant substances."  21 U.S.C. § 802(44).

[4]  Unlike the original indictment, the superseding indictment did not include a forfeiture allegation.  As will be discussed *infra*, the Government sought a superseding indictment after it learned that one of its law enforcement witnesses before the original grand jury mistakenly testified that Harris admitted to owning the drugs that were recovered at his house.  The prosecution presented the testimony of a different officer to the second grand jury to establish probable cause.

[5]  The criminal case was reassigned from Judge Anderson to the undersigned on July 11, 2018.  (No. 1:17-cr-10093-JDB-1, D.E. 55.)

4

The Defendant filed a notice of appeal.  (*Id.*, D.E. 101.)  On November 27, 2018, while the direct appeal was pending, trial counsel filed a document with the Court styled "Motion to Reconsider Sentence."  (*Id.*, D.E. 99.)  By that motion, Harris asked the Court to reconsider the life sentence in light of the fact that "[t]he United States Senate [was, at that time,] considering the passage of "The First Step Act[.]"  (*Id.*, D.E. 99 at PageID 610.)  "If passed, the Act would reduce mandatory minimum sentences under § 841(b)(1)(A) for two 'serious drug felonies' from life to 25 years."  (*Id.*, D.E. 99 at PageID 610.)  The motion noted that, "as currently written, the Act would not apply retroactively and Defendant would not be eligible for a sentence reduction under the Act."  (*Id.*, D.E. 99 at PageID 610-11.)

The First Step Act was signed into law on December 21, 2018.  *See* The First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (2018).  Section 401 of the statute did reduce the mandatory minimum sentence under § 841(b)(1)(A) from life to 25 years.  *Id.*, § 401(a)(2).  The law also provided that the amendments effected by § 401 "shall apply to any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment."  *Id.*, § 401(c).

By written order dated February 6, 2018, the Court denied the motion for reconsideration.  (No. 1:17-cr-10093-JDB-1, D.E. 111.)  The Court found that there was no legal basis for reconsidering and modifying the sentence.  The Court found that, as a general matter, there is no such thing as a motion to reconsider an otherwise final sentence.  And, more specifically, the Court found that Harris did not allege extraordinary and compelling reasons, advanced age, an arithmetical, technical, or other clear error in sentencing under Federal Rule of Criminal Procedure 35, or that a sentencing Guideline had been lowered since his sentencing.  The Court also found

that even if the Defendant had invoked Rule 35, he did not file his motion in time to take advantage of that rule.

On direct appeal, the Defendant was represented by Matthew Nee.  Appellate counsel raised the sole issue that the Court erred in denying the motion to suppress.  The Sixth Circuit found no error and affirmed.  (*Id.*, D.E. 118.)

DISCUSSION

Harris filed the Petition on September 23, 2020, together with a supporting brief.  (D.E. 1-1.)  He asserts in his pleading that trial counsel rendered ineffective assistance by failing to communicate with him so that he could make an informed decision about pleading guilty or proceeding to trial  (Claim 1), investigate and file appropriate pretrial motions (Claim 2), challenge Petitioner's predicate convictions for his enhanced sentence of life imprisonment (Claim 3), adequately review the presentence report (the "PSR") with him (Claim 4), and argue that the life sentence was substantively unreasonable (Claim 5).  Harris also posits that appellate counsel provided ineffective assistance by failing to challenge his life sentence on the ground that his prior convictions did not qualify as predicates for an enhanced sentence.  (Claim 6).[6]

The Respondent, United States of America, filed a response (the "Response") (D.E. 9), as well as an affidavit from trial counsel (D.E. 9-1), trial counsel's case notes (D.E. 9-2), and an affidavit from appellate counsel (D.E. 9-3).  The Government argues that the record in the present case and in the underlying criminal matter belie the claims.  Petitioner filed a reply (the "Reply"), insisting that his claims have merit.[7]  (D.E. 14.)  He also argues that the Court should consider the

---

[6] The Court has renumbered the claims for ease of discussion.

[7] Harris signed the Petition under penalty of perjury.  (*See* D.E. 1 at PageID 12.)  To the extent Petitioner presents new allegations in his Reply, they are unverified.

issue of whether attorney Parker, who posits in his affidavit that he was ineffective at sentencing with regard to the First Step Act, rendered ineffective assistance in that regard.

On March 31, 2023, Harris filed his motion to supplement the Petition to add claims of prosecutorial misconduct.  The Government filed a response opposing the motion (D.E. 20), and Petitioner submitted a reply (D.E. 21).

I.    Section 2255 Legal Standards

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either: (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (internal quotation marks omitted).  To establish an error of constitutional magnitude a petitioner "must demonstrate the existence of an error . . . which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  For a petitioner "to obtain relief under § 2255 on the basis of a nonconstitutional error, the record must reflect a fundamental defect in the proceedings that inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure." *McWhorter v. United States*, No. 97-6118, 1998 WL 399620, at *1 (6th Cir. June 11, 1998) (citing *Reed v. Farley*, 512 U.S. 339, 348 (1994); *United States v. Todaro*, 982 F.2d 1025, 1028 (6th Cir. 1993) (per curiam)).

A claim that an attorney's ineffective assistance has deprived a criminal defendant of his Sixth Amendment right to counsel alleges an error of constitutional magnitude cognizable in a § 2255 proceeding.  *See Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).  Such a claim is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984).  *Id.* at 966.

To succeed on an ineffective-assistance claim, a petitioner must demonstrate two elements: (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceedings] cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply "a strong presumption" that the attorney's representation was "within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted).

To demonstrate prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693). Instead, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair [proceeding] whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

*Strickland*'s two-part test also applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). A petitioner meets the deficient performance prong by showing that "his appellate counsel made an objectively unreasonable decision by choosing to raise other issues instead of" the challenged issue, "meaning [the challenged] issue 'was clearly stronger than issues that counsel did present.'" *Webb v. Mitchell,*

586 F.3d 383, 399 (6th Cir. 2009) (quoting *Robbins*, 528 U.S. at 285, 288).  The prejudice prong requires a petitioner to "demonstrate 'a reasonable probability that, but for his counsel's unreasonable failure to' raise th[e] issue on appeal, 'he would have prevailed.'" *Id.* (quoting *Robbins,* 528 U.S. at 285).

II.    Claim 1

Petitioner asserts that trial counsel rendered ineffective assistance by failing to communicate with him so that he could make an informed decision about pleading guilty or proceeding to trial.  In his brief accompanying the Petition, he recites Rule 1.4 of the Tennessee Rules of Professional conduct, which lists general ways an attorney should communicate with his client.  He then presents the following allegations in support of Claim 1:

> In this case, there was not any reasonable communication from the beginning of his case between the parties so that Harris could effectively participate in his legal representation.  Parker certainly did not meet the standard set forth above in Rule 1.4 of the Tennessee Rules of Professional Conduct or any other professional norm for that matter.  He failed to reasonably consult with Harris about the means to be used to accomplish his objectives.  From the time Parker was appointed as Harris' counsel, Parker had been dismissing Harris' input in this case, e.g.[,] interviewing witnesses, filing for a *Franks* hearing, etc.  He only pushed Harris to plead guilty.

(D.E. 1-1 at PageID 28.)

Respondent argues that the record shows that Parker engaged in detailed and frequent communications with his client and investigated facts, and that Petitioner was not prejudiced by counsel's conduct.  In support, the Government relies on counsel's affidavit and his case notes and copies of correspondence.  In his affidavit, Parker avers that he had "numerous communications with" Harris.  (D.E. 9-1 at PageID 76.)  Specifically, Petitioner sent letters to counsel in February, April, and May of 2018 discussing the warrant affidavit and Officer Rickman's "personal issue with [him] because [he] knocked his teeth out"; telling counsel "I talked to David Baggett and he

9

is going to give me a job and will come for the bond hearing and testify to that"; and informing counsel "I don't want to use Selina Kennedy" "to come to court for me," but "would like to see if we can use people from the facebook post Mercedes done," and Mercedes "is supposed to be keeping you informed." (D.E. 9-2 at PageID 80-83.) Petitioner also told counsel, "I will fight with every breath in my body. A plea bargain is out of the question," and "I know exactly what I am facing and the odds of beating the government." (*Id.* at PageID 81-82.)

Counsel wrote to Harris on June 4, 2018, and enclosed a copy of the search warrant affidavit. (D.E. 9-2 at PageID 86.) Counsel "informed [Petitioner] if he chose to proceed with his motions to suppress and trial, he would be facing a mandatory life sentence if convicted at trial." (D.E. 9-1 at PageID 76 (referencing D.E. 9-2 at PageID 86-87).) In that correspondence, Parker also explained to Harris, "You wrote to me regarding Selina Kennedy. I haven't heard from her. In fact, no one has contacted me on your behalf regarding your case since the bond hearing. I also know nothing about Mercedes doing a Facebook post." (D.E. 9-2 at PageID 86.) Counsel further responded to his client's "issues with the AUSA's response to [the] Motion to Suppress," his "identification of differences between the response and the affidavit," and his concerns that United States Attorney Michael Dunavant had a conflict of interest. (*Id.*) In the last paragraph of his letter, counsel also advised Petitioner:

> Your motion to suppress is set for a hearing on July 3, 2018 at 1:30 p.m. in Jackson. When we meet, we need to have a very serious discussion about whether or not we should go forward with that hearing and a trial in this matter. The prosecutor has indicated that he will be filing an information pursuant to 21 U.S.C. [§] 851 if we proceed. This will result in you receiving a mandatory life sentence if you are convicted at trial. That is much longer and more significant than the "it might as well be life" sentence that you would receive otherwise.

(*Id.* at PageID 87.)

10

Counsel then met with Petitioner "in the jail on June 5, 2018." (D.E. 9-1 at PageID 76.) His case notes, which "summarize[] [that] conversation," (*id.*), show that counsel gave a "copy of [a] letter to [Harris] to read," discussed what Harris said his previous attorney told him about his sentencing exposure, and "went over concerns [about] 404(b)," (D.E. 9-2 at PageID 78). The case notes also record that Harris told counsel the following at that meeting: that officers Rickman and Holley "did terribly" at a suppression hearing for an individual named "Joshua Tucker," that Harris "wants 8 yrs or less if he's going to plea," and that he "would rather have a full life sentence so gov't can take care of him vs. getting out @ 60 years old & everyone he loves is dead." (*Id.*) Petitioner signed the bottom of the case notes, with the declaration "If the prosecution is not willing to come down to something reasonable, like 8-10 years, then I will not plead guilty." (*Id.*) In a letter to Parker sent shortly after their meeting, Petitioner reiterated, "I don't want no plea bargain because there's no way I'm waiving my rights." (*Id.* at PageID 84.)

Respondent also relies on the record in the underlying criminal case to demonstrate that counsel "was familiar with the facts of the case." (D.E. 9 at PageID 67.) The Government notes that at the hearing on the motion to suppress, counsel "vigorously cross-examined the two law enforcement witnesses about the facts and their recollection," and "cross examined an officer's reason for leaving his previous agency." (D.E. 9 at PageID 66-67 (citing Motion Suppress Hearing Transcript, No. 1:17-cr-10093-JDB-1, D.E. 57 at PageID 108-98).) And, "[w]hen a witness couldn't remember the name of another potential witness, Parker knew her name." (*Id.*).

To the extent Petitioner alleges that counsel should have interviewed witnesses for a *Franks* hearing and filed a motion for such a proceeding, the Court considers those allegations in its discussion of Claim 2, *infra*. Insofar as Harris alleges that counsel did not communicate with him in compliance with Rule 1.4 of the Tennessee Rules of Professional conduct and "failed to

reasonably consult with [him] about the means used to accomplish his objectives," he does not provide any specifics.  In contrast, counsel has attested in detail to his pretrial communications with Petitioner.  In addition, the record in the underlying criminal case shows that counsel followed-up his June 5, 2018, in-person discussion with Harris about the "404(b)" evidence with a successful motion to exclude that evidence.  (*See* No. 1:17-cr-10093-JDB-1, D.E. 72.)  Counsel also filed a motion for release on bond based on Petitioner having informed him in his April 5, 2018, letter that David Baggett would provide him a job, and counsel produced Mr. Baggett at the bond hearing.  (*Id.*, D.E. 39, 42.)  In light of the record, Petitioner has failed to establish that counsel's pretrial communications with him were deficient.

The inmate has also failed to demonstrate that he was prejudiced by counsel's conduct.  The record shows, and Petitioner does not dispute, that he was adamant that he wanted to proceed to trial and would only accept a plea bargain that offered "something reasonable, like 8-10 years."  Harris has therefore not established a reasonable probability that he would not have proceeded to trial had counsel done more.  Claim 1 is without basis and is DENIED.

III.   <u>Claim 2</u>

Harris argues that trial counsel was ineffective for failing to investigate and file appropriate pretrial motions.  He posits, specifically, that Parker should have sought a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the search warrant because the warrant affidavit was based on hearsay.  He also argues that the warrant affidavit contained information by the affiant, Officer Rickman, that was different from Rickman's testimony before the grand jury that returned the superseding indictment, and also differed in some respects from the testimonies of Wilbanks and Gilbert at the suppression hearing.  Petitioner also maintains that counsel should have sought a *Franks* hearing because he would have thereby developed evidence to "impeach the officers[']

testimony at the suppression hearing such as there were five (5) officers at Harris' house not three (3) that came to arrest him," or "subpoenaed [Officer] Holly's phone records [to] prove that he was at Harris' house before they had a search warrant." (D.E. 1-1 at PageID 31.) He says this evidence would have "proved that the officers were lying about Harris giving consent to search his house." (*Id.*) The inmate also alleges that counsel told him that he did not seek a *Franks* hearing because "he didn't want to piss the judge off." (*Id.* at PageID 28.)

Respondent argues that counsel's decision not to seek a *Franks* hearing was a matter of reasonable trial strategy and that, even if counsel performed deficiently, Petitioner was not prejudiced by counsel's conduct. In support, it points to correspondence from Harris to Parker raising the issue of discrepancies between the Government's response to the suppression motion and the search warrant affidavit, and counsel's letter in response. In that latter document, counsel explained to his client:

> As for your identification of differences between the response and the affidavit, Officer Gilbert very easily could have left the back of your residence once you were detained and gone to the front. From there he could "accompany" you inside the residence and witnessed the contraband. After seizing what was in "plain view" then they would apply for a search warrant to see if any other contraband was present. Sadly, this does not constitute a lie at this time.

(D.E. 9-2 at PageID 86.)

In *Franks*, the Supreme Court held:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

*Franks*, 438 U.S. at 155–56. The substantial showing "must overcome the presumption that the affidavit is valid." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 648 (6th Cir. 2003).

"[A] truthful showing of probable cause 'does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct.'"  *United States v. Hawkins*, 969 F.2d 169, 177 (6th Cir. 1992) (quoting *Franks*, 438 U.S. at 165).  Instead:

> Probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily . . . . It is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

*Id.* (quoting *Franks*, 438 U.S. at 165) (citations and alterations omitted).

Harris has not overcome the "strong presumption" that counsel's decision not to seek a *Franks* hearing can "be considered sound trial strategy."  *Strickland*, 466 U.S. at 689.  Regarding Petitioner's allegation that Rickman's affidavit contradicted his testimony before the grand jury on the superseding indictment, that testimony was given in July 2018, just weeks before the trial.  Therefore, counsel could not have used that testimony to challenge the search warrant in a *Franks* hearing.  Insofar as Petitioner believes counsel should have challenged the affidavit because Rickman attested to the circumstances of the arrest and plain view seizure of the methamphetamine without having been present at the home, he does not show that Rickman did not believe or did not appropriately accept the information as true.

In addition, as evidenced by counsel's letter to Petitioner, there were plausible explanations for the differences between the Government's response to the motion to suppress and the warrant affidavit such that it would have been difficult for counsel to make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by Rickman in his affidavit.  And although Petitioner alleges that counsel told him that he did not want to file a *Franks* motion because he did not want to "piss off the judge," the letter counsel wrote to him at the time evidences a separate, reasonable basis

counsel had for deciding not to file one.  In light of this, counsel's decision not to pursue a *Franks* hearing was reasonable.

But even assuming that counsel's performance was deficient, the inmate has not shown that he was prejudiced by counsel's conduct.  For one thing, Harris has not demonstrated that he would likely have succeeded on a *Franks* motion.  For another, the methamphetamine was seized prior to law enforcement obtaining the search warrant.  Therefore, any statements made in the affidavit supporting that warrant would not have entitled Harris to suppression of the drugs.

Lastly, Petitioner's insistence that he was prejudiced by the absence of a *Franks* hearing because such a proceeding would have produced testimony to impeach the Government's witnesses at the suppression hearing regarding the number of officers at the scene, and thus would have proved that Petitioner did not give officers consent to conduct a protective sweep of his house, is unsupportable.  Harris does not show how that information would have been central to the question of whether he gave consent for a protective sweep of his home.  Similar to the discrepancies in the witnesses' testimonies noted by Judge Anderson in his order denying the motion to suppress, "any inconsistenc[ies]" about the number of officers at the scene would only have gone "to the strength of each officer's testimony about how the sweep was carried out, not whether they had Defendant's voluntary consent to enter the home."  (No. 1:17-cr-10093-JDB-1, D.E. 54 at PageID 104.)

In sum, Petitioner has failed to establish that counsel rendered ineffective assistance regarding pretrial investigations and motions.  Claim 2 is therefore DENIED.

IV.    Claims 3 and 6

As discussed above, at the time of Petitioner's sentencing, § 841 provided for an enhanced mandatory minimum sentence of life in prison because he had at least two prior convictions for a

felony drug offense.  Harris's predicate offenses were two Tennessee convictions for the delivery

of drugs and two Tennessee convictions for possession of drugs with intent to deliver or sell.

Petitioner contends in Claims 3[8] and 6, respectively, that trial counsel was ineffective for failing

to challenge the use of his prior convictions as predicates for the sentence enhancement, and that

appellate counsel rendered ineffective assistance by failing to raise the issue on appeal.  He argues

that his Tennessee drug convictions do not qualify as felony drug offenses under the "categorical

approach," as that method is applied in cases involving the Armed Career Criminal Act ("ACCA"),

18 U.S.C. § 924(e)(1), and the United States Sentencing Commission *Guidelines Manual* (the

"Guidelines").  *See generally Mathis v. United States*, 579 U.S. 500, 504–06 (2016) (describing

categorical and modified categorical approaches).

The Government argues that Claims 3 and 6 are without merit because the "categorical

approach" does not apply to the determination of whether a defendant has a prior felony drug

offense.  Respondent also relies on appellate counsel's affidavit, wherein he avers:

> When I was appointed to represent Mr. Harris, I thoroughly reviewed his case and the record for possible appellate issues to present to the Sixth Circuit. The life sentence was not one I identified as a viable issue to argue before the Court.  The law was clearly against any such argument at the time I filed the brief in support of Mr. Harris, as he had the qualifying underlying convictions to invoke a life sentence under 21 U.S.C. 841(b)(1)(A).

> I did challenge whether the search of his home complied with the Fourth Amendment, and thought this to be the strongest argument to present to the Sixth Circuit on behalf of Mr. Harris.  In my appellate practice, strategic choices are sometimes made to appeal some issues that may have viability before the courts,

---

[8]    The inmate also argues that trial counsel should have objected to the use of his prior Tennessee convictions on the ground that the Court did not ask Harris at sentencing to affirm or deny that he had those prior convictions or tell him that any challenge to a prior conviction which is not made before the sentence is imposed may not thereafter be raised to attack the sentence. (D.E. 1-1 at PageID 33.)  The claim is not well-pleaded, as Petitioner does not allege that he was prejudiced by counsel's purportedly deficient performance.  More to the point, he does not identify any argument that could have been raised to challenge the fact or validity of the prior convictions.

and not to appeal issues that have little or no chance of prevailing.  This is why I
chose not to appeal any claim regarding his life sentence.

(D.E. 9-3 at PageID 90.)

Harris cannot demonstrate that his attorneys were ineffective.  It is well established that
counsel's "failure to make futile objections does not constitute ineffective assistance[.]"  *Altman
v. Winn*, 644 F. App'x 637, 644 (6th Cir. 2016).  Since 2001, it has been precedent in this circuit
that "when evaluating § 841(b) predicate offenses," courts are not to "employ the 'categorical
approach' as [is done] for other statutes, like the Armed Career Criminal Act[.]"  *United States v.
Brown*, No. 21-1663, 2023 WL 1861318, at *9 n.3 (6th Cir. Feb. 9, 2023) (citing *United States v.
Soto*, 8 F. App'x 535, 541 (6th Cir. 2001) ("[T]his court does not employ a categorical approach
to determining whether a prior conviction constitutes a 'felony drug offense' for purposes of
section 841(b)(1)."), *cert. denied*, 143 S. Ct. 2622 (2023)).[9]  Therefore, trial counsel's failure to
raise the futile issue, and appellate counsel's decision to raise only the clearly stronger issue of the
denial of the suppression motion, do not constitute deficient performance and Petitioner was not
prejudiced by their conduct.

Prejudice is elusive for the additional reason that, even if the categorical approach applied
to Petitioner's prior convictions, he still would qualify for the enhancement.  *Cf. United States v.
Goldston*, 906 F.3d 390, 394–95 (6th Cir. 2018) (the Tennessee crime of sale or delivery of a
controlled substance is categorically a serious drug offense for purposes of the ACCA); *United*

---

[9] In the Sixth Circuit's recent decision in *Brown*, the court recognized that this circuit is
"apparently on one side of a lopsided circuit split," as all other circuits to have considered the issue
"have . . . concluded that courts must use the categorical approach to determine whether a particular
prior felony drug offense qualifies for purposes of § 841(b)'s statutory enhancement."  *Brown*,
2023 WL 1861318, at *9 n.3 (citing *United States v. Thompson*, 961 F.3d 545, 551 (2d Cir. 2020)
(collecting cases)).

*States v. Coleman*, 977 F.3d 666, 670 (8th Cir. 2020) (Tennessee possession-with-intent-to-deliver is categorically a serious drug offense under the ACCA); *Leatherwood v. United States*, No. 3:10-CR-7, 2020 WL 3273023, at *6 (E.D. Tenn. June 17, 2020) (same); *United States v. Garth*, 965 F.3d 493, 497–98 (6th Cir. 2020) (Tennessee possession-with-intent-to-deliver is categorically a controlled substance offense under the Guidelines).

Claims 3 and 6 are without merit and are DENIED.

V.    <u>Claim 4</u>

Harris asserts that trial counsel rendered ineffective assistance by failing to adequately review, explain, or discuss the PSR with him prior to sentencing.  He alleges that counsel only "briefly reviewed the PSR with" him and "did not explain it to him so that he could understand the sentencing calculations and the relevant conduct of the offense."  (D.E. 1-1 at PageID 33.)

The Government argues that the claim is without merit.  In support of its position, Respondent relies on Petitioner's statements at the sentencing hearing and also on trial counsel's affidavit and supporting documents.  Respondent's position that the claim is belied by the record is well taken.

At sentencing, Petitioner addressed the PSR and represented to the Court that counsel had reviewed and discussed the document with him:

> THE DEFENDANT: First of all, I just want to—I want to say that this is my first and only meth charge.  I've never been convicted of a methamphetamine charge.  I know they put in the Presentence Investigation that I've got numerous relevant conduct in the presentence investigation but all them charges have been dismissed.
>
> * * *
>
> THE COURT: I need to ask you one question, Mr. Harris.  Did you have an opportunity to receive and review a copy of the Presentence Report and discuss that with your attorney, sir?
>
> THE DEFENDANT: Yes, I did.

THE COURT: Okay. All right.

THE DEFENDANT: And I just want to say, Your Honor, like I said, all them prior charges that they're bringing up as relevant conduct, all of them charges have been dismissed. I've not been convicted of none of them. The ones that you seen, yes, I did get convicted of, but all the ones in the PSI, all of the methamphetamine charges, they was all dismissed.

THE COURT: You mean the other two that they were—that the probation office spoke about?

THE DEFENDANT: 17 grams.

THE COURT: I'm not even considering those.

THE DEFENDANT: Yeah. They're gone. Okay.

(No. 1:17-cr-10093-JDB-1, D.E. 113 at PageID 678-83.)

In the present matter, Petitioner does not explain his clear familiarity with the PSR at the time of sentencing, why he represented to the Court that counsel reviewed and discussed the PSR with him but did not qualify that statement with an assertion that the review was inadequate, or why he did not speak up at the hearing about his alleged lack of understanding of that document. The Court notes that Harris freely communicated with the undersigned at the sentencing hearing his complaints about the Government and about defense counsel's decision not to file a motion for a *Franks* hearing. (*See, e.g.*, *id.*, D.E. 113 at PageID 679-83.)

What is more, Petitioner's statements at sentencing are consistent with Parker's *detailed* averments in his affidavit and supporting document. In pertinent part, Parker avers that he mailed his client the PSR on October 3, 2018. (D.E. 9-1 at PageID 76.) In his cover letter accompanying the PSR, Parker tells Harris, "I need for you to carefully review [the PSR] and note <u>any</u> errors, no matter how small, for me." (D.E. 9-2 at PageID 89 (emphasis in original).) Counsel further states in his letter that he was planning to visit Harris before the sentencing hearing, "but if [he was] not able to do so, [he would] call [him] to discuss it." (*Id.*) Counsel also avers that he and Harris did

19

meet "in person for more than an hour on October 25, 2018, and met again on November 6, 2018 to discuss the Presentence Report."  (D.E. 9-1 at PageID 76-77.)

Accordingly, in light of the record in this matter and in the underlying criminal case, Petitioner's bare allegation that counsel did not adequately discuss the PSR with him is insufficient to establish that counsel performed deficiently.  Claim 4 is DENIED.

VI.    Claim 5

Petitioner maintains that trial counsel was ineffective for failing to argue that a life sentence was substantively unreasonable.   The claim is belied by the record.  In his sentencing position paper, counsel maintained that a life sentence would "constitute[] cruel and unusual punishment in violation of the 8th Amendment to the United States Constitution," and would also be "in violation of the sentencing factors found in 18 U.S.C. § 3553(a)[.]"  (No. 1:17-cr-10093-JDB-1, D.E. 88 at PageID 556.)   At the sentencing hearing, counsel reiterated both of those challenges to the imposition of a life sentence, and, notwithstanding the mandatory minimum, he requested a sentence of thirty years' incarceration. (*Id.*, D.E.  113 at PageID 673.)  As Claim 5 is without merit, it is DENIED.

VII.    Motion to Supplement Petition

Liberally construing Petitioner's motion to supplement the Petition, as well as his reply brief in support of the motion, the Court finds that the inmate seeks leave to assert two prosecutorial misconduct claims: (1) that Assistant United States Attorney ("AUSA") Matthew Wilson withheld from the defense, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), the fact that Agent Tankersley had falsely testified at the October 16, 2017, grand jury proceeding that Petitioner had admitted the methamphetamine was his and (2) that Wilson's withholding of that information from July 3, 2018,  the day Wilson allegedly learned the testimony was false, through July 16, 2018, the

date the superseding indictment was returned, was prosecutorial misconduct resulting in "13 days" of "illegal" detention of Harris under the original indictment.  (D.E. 18 at PageID 114.)

Harris's "newly discovered" evidence is Wilson's August 9, 2022, letter to the Tennessee Board of Professional Responsibility of the Supreme Court of Tennessee responding to Petitioner's complaint against him.  (D.E. 18-2 at PageID 122-25.)  In pertinent part, Wilson explains in his letter that "[h]aving recently participated in the [July 3, 2018,] motion to suppress hearing, and in preparation for trial, [he] reviewed the testimony of John Tankersley, an agent for the Drug Enforcement Administration, who had testified before the October 16, 2017 grand jury."  (*Id.* at PageID 123.)  "Agent Tankersley had not been present when the search of Mr. Harris's house had been conducted, but had testified as a summary witness before the grand jury."  (*Id.*)  While reviewing the agent's testimony, Wilson "discovered that in the grand jury proceeding, Mr. Tankersley had stated that Mr. Harris had made an admission that the methamphetamine was his." (*Id.*)  However, following the "suppression hearing, [Wilson] consulted the law enforcement officers who had been present on February 13, 2017, and none recalled Mr. Harris had made such an admission."  (*Id.*)  Wilson represents that "[b]efore [his] consultation with the other officers following the July 3, 2018 hearing, [he] was unaware Agent Tankersley's testimony was inaccurate on Mr. Harris having made an admission claiming ownership of the methamphetamine."  (*Id.*)

Wilson further explains in his letter that "after consulting [his] supervisors, [he] decided to present the case to another grand jury with another witness," namely, Officer Rickman.  (*Id.*)  The AUSA presented his case on July 16, 2018, which "was the next grand jury meeting in the Eastern Division of the Western District of Tennessee."  (*Id.*)  The grand jury returned a superseding "indictment against Mr. Harris for the same activity, without considering Agent Tankersley's testimony in finding of probable cause."  (*Id.* at PageID 123-24.)

Wilson represents that "[s]hortly before trial, [he] discovered that while Agent Tankersley had not been present for the search at Mr. Harris's residence on February 13, 2017, he would be required as a witness in the trial for his limited role in sending the methamphetamine to the laboratory for testing." (*Id.* at PageID 124.)  Although a prosecutor's "obligation pursuant to the federal *Jencks* Act, codified in 18 U.S.C. § 3500, requires disclosure of a witness's testimony after he or she has testified at trial," Wilson "provided a copy of Agent Tankersley's grand jury testimony to John Parker, Mr. Harris's attorney," on August 8, 2018, just prior to the start of the trial.[10] (*Id.*)  At the trial, Agent Tankersley acknowledged on direct and cross examinations that he had mistakenly testified before the grand jury that Harris admitted the drugs were his. (*Id.*; *see also* No. 1:17-cr-10093-JDB-1, D.E. 86 at PageID 423-24, 426-28.)  The agent explained that he was confused at the time of his grand jury testimony due to his caseload and the fact that his wife was dying of cancer.  (D.E. 18-2 at PageID 124; No. 1:17-cr-10093-JDB-1, D.E. 86 at PageID 424.)

Petitioner's motion to amend the Petition is governed by Rule 15 of the Federal Rules of Civil Procedure.  *See* 28 U.S.C. § 2242; *see also* Rule 12 of the *Federal Rules Governing Section 2255 Proceedings in the United States District Courts*.  Rule 15 provides that a "court should freely give leave" to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2).  However, leave should not be granted when the amendment would be futile.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

---

[10]   The Jencks Act provides that, upon the defendant's motion, the prosecution must produce copies of any statement made by a witness called by the Government that relates to the subject matter of the testimony, if the Government has the statement in its possession.  *See* 18 U.S.C. § 3500; Fed. R. Crim. P. 26.2(a).

In *Brady*, the Supreme Court held that a criminal defendant's right to due process is violated when prosecutors withhold from the defense evidence favorable to the accused, where the evidence is material either to guilt or punishment.  *Brady*, 373 U.S. at 87.  A *Brady* violation has three components: "the evidence at issue must be favorable to the accused. . . ; [the] evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008) (quoting *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999)).  "[T]he third *Brady* factor of prejudice [is] also described as the 'materiality' of the evidence."  *Brooks v. Tennessee*, 626 F.3d 878, 891 (6th Cir. 2010) (citing *Strickler,* 527 U.S. at 282).  "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  "The Supreme Court has clarified that '[t]he question is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'"  *Hughbanks v. Hudson*, 2 F.4th 527, 540 (6th Cir. 2021) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

Amendment of the Petition to allow Harris to bring his *Brady* claim would be futile because the claim is without merit.[11]  Even assuming the information regarding Tankersley's false grand

---

[11] As Respondent points out, the *Brady* claim is also untimely.  Twenty-eight U.S.C. § 2255 provides that "[a] 1-year period of limitation shall apply to a motion under this section." 28 U.S.C. § 2255(f).  In most cases, the running of the limitations period begins to run on "the date on which the judgment of conviction becomes final[.]" 28 U.S.C. § 2255(f)(1).  For a defendant who takes a direct appeal but does not seek review in the Supreme Court, the conviction becomes final ninety-days after the circuit court's decision.  *Sanchez-Castellano v. United States,* 358 F.3d 424, 426–27 (6th Cir. 2004).  In Harris's case, the Sixth Circuit denied his direct appeal on September 17, 2019.  Ninety-days after that date was Monday, December 16, 2019.  The limitations period began to run the next day and expired one year later on Thursday, December 17, 2020.  Petitioner filed his motion to amend on March 31, 2023, which was more than two years beyond the expiration of

jury testimony was "favorable" to the defense and was "suppressed," Petitioner could not show that the information was "material" to his guilt or punishment.  Agent Tankersley was not called to testify at trial about the search of Petitioner's home or any supposed admissions made by Petitioner, but rather, only about the agent's role in sending the drugs to the lab.  The Government disclosed the falsity of Tankersley's grand jury testimony to defense counsel prior to the agent taking the stand and counsel used the testimony in his cross-examination of the witness.  The jury heard all of that and still convicted Petitioner.

Amendment of the Petition to allow Harris to bring his non-*Brady* prosecutorial misconduct claim would also be futile because he has not alleged an error of constitutional magnitude cognizable in a § 2255 proceeding.  Petitioner posits that the harm he suffered as a result of AUSA Wilson's failure to disclose Tankersley's false grand jury testimony for the thirteen days between July 3 to July 16, 2018, was Petitioner's alleged illegal detention on the original indictment during that time period.  But that alleged harm is not the type of prejudice Petitioner must show to secure relief in this § 2255 proceeding.  More to the point, to establish an error of constitutional magnitude, a § 2255 petitioner "must demonstrate the existence of an error . . . which had a substantial and injurious effect or influence on the guilty plea or *the jury's verdict*."  *Griffin*, 330 F.3d at 736 (emphasis added).  The thirteen days of allegedly illegal pretrial detention has no relation to the outcome of Harris's trial or his current detention under his judgment of conviction. *See, e.g.*, *Killen v. United States*, No. 21-10888-E, 2021 WL 7159181, at *6 (11th Cir. Sept. 8,

_____

the limitations period.  The claim does not relate back to the filing date of the Petition, as it does not arise "out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]"  Fed. R. Civ. P. 15(c)(1)(B).  In addition, the claim does not fall under § 2255(f)(4), because the predicate for the *Brady* claim was known by Petitioner at the time of Wilson's disclosure of the information in August 2018, or "could have been discovered through the exercise of due diligence" at that time.  28 U.S.C. § 2255(f)(4).

2021) ("Because these claims concern only the conditions of Mr. Killen's pretrial detention and not the validity of his convictions or sentences, they are not cognizable in a § 2255 motion."), *cert. denied*, 142 S. Ct. 1168 (2022); *United States v. Groenendal*, No. 1:11-CR-260, 2020 WL 3046010, at *29 (W.D. Mich. June 8, 2020) ("[A]ny violation of Defendant's rights with respect to his pretrial detention is irrelevant in this [§ 2255] matter. . . . [E]ven a successful challenge to the legality of his pretrial detention would not entitle Defendant to [§ 2255] relief."). The motion to amend is therefore DENIED.

VIII.   <u>Putative Claim Regarding the First Step Act</u>

As discussed herein, the First Step Act reduced the mandatory minimum sentence under § 841(b)(1)(A) from life to 25 years, but only for a defendant whose sentence had not yet been imposed by the date of the statute's enactment, which was December 21, 2018. In his affidavit, Parker opines that he was ineffective in two ways related to the First Step Act, which was passed six weeks after Petitioner was sentenced. Specifically, counsel insists that he should have sought to delay the sentencing hearing and should have timely filed his motion for reconsideration of the sentence:

> While the First Step Act was not signed into law until December 21, 2018, I believe[] that if the new rules were applied to Mr. Harris, it could have had a positive impact on his sentence. I absolutely believe that I could, and should, have acted with more haste to file my motion or sought to delay his sentencing until January, 2019.

(D.E. 9-1 at PageID 77.)

The Government argues in its Response that the Court should not consider the issue because Harris did not present it as a claim in the Petition. Respondent maintains in the alternative that the assertion of attorney ineffective assistance is without merit because an attorney is not

deficient in failing to predict changes in the law.  Petitioner requests in his Reply that the Court consider the issue.

The putative claim is not properly before the Court for several reasons.  First, Petitioner asserted the issue for the first time in his Reply.  *See Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir. 2005) (a claim "first presented in [a petitioner's] traverse rather than in his habeas petition, [is] not properly before the district court, and the district court [does] not err in declining to address it.").  Second, the inmate could have, but did not, file a motion to amend the Petition to add the claim.  That he knew to do so is evidenced by the fact that he filed a motion to supplement the Petition to add his prosecutorial-misconduct claims.  Third, even if Petitioner had filed a motion to amend soon after the Government's filing of counsel's affidavit on January 8, 2021, amendment would have been futile.  More to the point, by the time the affidavit was filed, the one-year statute of limitations for raising the claim had already expired.  In addition, the untimely claim would not have been spared dismissal on relation-back grounds, as it does not arise "out of the conduct, transaction, or occurrence set out . . . in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

But even if the claim were properly before the Court, Petitioner would not be entitled to relief.  First, with regard to counsel's failure to file his motion to reconsider within the time allowed by Federal Rule of Criminal Procedure 35, the Court found the motion's untimeliness to be only one of several reasons to deny the motion.  What is more, because the "sentence was lawful," the motion for reconsideration was "futile."  *Downs v. United States*, 879 F.3d 688, 690–91 (6th Cir. 2018) (counsel was not ineffective for failing to file a futile motion for reconsideration of defendant's lawful sentence).  There is no ineffective assistance in an attorney's failure to file—or in this case, timely file—a futile motion.  *See Altman*, 644 F. App'x at 644.

Secondly, counsel did not perform deficiently by failing to seek a continuance of the sentencing hearing.  As a general matter, counsel does not perform deficiently by failing to predict changes in the law.  *Thompson v. Warden, Belmont Corr. Inst.*, 598 F.3d 281, 288 (6th Cir. 2010).  With regard to the First Step Act specifically, courts have found no deficient performance in a defense attorney's failure to seek a postponement of a sentencing hearing in anticipation of the Act's passage.  *See, e.g.*, *United States v. Juliano*, 12 F.4th 937, 941 (9th Cir. 2021) (rejecting petitioner's claim that counsel was ineffective for failing to seek a continuance of the sentencing hearing prior to enactment of the First Step Act, reasoning that "the law that [petitioner] argues his counsel allegedly failed to anticipate was not actually law at the time of his counsel's challenged conduct.  Nor was it certain that it would become law. Only a fraction of proposed legislation eventually becomes law."); *McCall v. United States*, No. 2:19-CV-481-MHT-JTA, 2022 WL 3273065, at *5–6 (M.D. Ala. July 18, 2022) (counsel did not render ineffective assistance by failing "to ask the court for a continuance [of sentencing] based on" the "potential" passage of the First Step Act, as "counsel could not have known whether the law would pass" or "what the law would say if it was passed"), *report and recommendation adopted*, No. 2:19CV481-MHT, 2022 WL 3230420 (M.D. Ala. Aug. 10, 2022); *United States v. Brown-Lovelace*, No. 0:17-CR-10-DLB-2, 2019 WL 7666995, at *2 (E.D. Ky. Dec. 12, 2019) (counsel did not perform deficiently at sentencing by failing to anticipate the First Step Act's eventual passage, despite counsel's averment that he had rendered ineffective assistance), *report and recommendation adopted*, No. CR 17-10-DLB-EBA-2, 2020 WL 390893 (E.D. Ky. Jan. 23, 2020).

In sum, the putative claim relating to counsel's failure to file a timely motion for reconsideration of the sentence or a motion to delay sentencing is not properly before the Court. And, because the claim is without merit, it would afford Petitioner no relief in any event.

For the foregoing reasons, the Petition is DENIED.   Judgment shall be entered for Respondent.

APPEAL ISSUES

A § 2255 petitioner may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2)-(3).  A substantial showing is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

> If the petition was denied on procedural grounds, the petitioner must show, "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."

*Dufresne v. Palmer*, 876 F.3d 248, 252–53 (6th Cir. 2017) (per curiam) (quoting *Slack*, 529 U.S. at 484).

In this case, reasonable jurists would not debate the correctness of the Court's decision to deny the Petition.  Because any appeal by Petitioner does not deserve attention, the Court DENIES a certificate of appealability.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.  Fed. R. App. P. 24(a).  However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, the prisoner must file his motion to proceed in forma pauperis in the appellate court.  *Id.*

In this case, for the same reason it denies a COA, the Court CERTIFIES, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith.  Leave to appeal in forma pauperis is therefore DENIED.[12]

IT IS SO ORDERED this 18th day of August 2023.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[12] If Petitioner files a notice of appeal, he must also pay the full $505.00 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days.